**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

|  |  |
|---|---|
| GLOBAL CAPITAL PARTNERS, LLC and ACCESS MANAGEMENT, S.A.S., INC.,<br><br>      Plaintiffs,<br><br>      v.<br><br>GREEN SAPPHIRE HOLDINGS INC.,<br><br>      Defendant. | C.A. No. 2024-0877-JTL |
| ALPHA CARTA, LTD.,<br><br>      Third-Party Plaintiff,<br><br>      v.<br><br>GREEN SAPPHIRE HOLDINGS INC., and GLOBAL CAPITAL PARTNERS LLC,<br><br>      Third-Party Defendants. | |

**MEMORANDUM OPINION ADDRESSING CONTEMPT**

Date Submitted: June 15, 2026
Date Decided: June 23, 2026

Philip Trainer, Jr., Samuel M. Gross, ASHBY & GEDDES, P.A., Wilmington, Delaware; Kenneth J. Pfaehler, Nicholas W. Petts, DENTONS US LLP, Washington, District of Columbia; *Attorneys for Global Capital Partners, LLC and Access Management, S.A.S., Inc.*

Andrew S. Dupre, Brian R. Lemon, AKERMAN LLP, Wilmington, Delaware; Sean J. Bellew, BELLEW LLC, Wilmington, Delaware; *Attorneys for Green Sapphire Holdings, Inc.*

**LASTER, V.C.**

Plaintiffs Global Capital Partners, LLC (the "Lender") and Access Management, S.A.S., Inc. ("Access Florida") ask the court to hold Green Sapphire Holdings, Inc. (the "Borrower") in contempt for violating the final order and judgment entered in this action (the "Judgment"). The Lender and Access Florida also seek to hold in contempt the individuals who control the Borrower and have caused it to act: non-parties A.R. Thane Ritchie, Paul Wolfe, and Garrett Vail.

The Judgment mandated that the Borrower take specified actions. The Judgment also permanently enjoined the Borrower from taking contradictory actions.

Rather than complying with the Judgment, the Borrower filed a motion in a pending bankruptcy proceeding that challenged its validity. The motion reported that the Borrower and Vue Mer Signature Holdings ("Vue Mer"), an entity that the Judgment determined was identical to Access Florida, had filed four new proceedings in foreign courts. Like the bankruptcy motion, the foreign proceedings sought to relitigate issues addressed by the Judgment.

The court issued an order to show cause why the Borrower, Ritchie, Wolfe, and Vail should not be held in contempt. The Borrower retained additional Delaware counsel and responded.

The Borrower discharged the order to show cause as to the bankruptcy motion. The Borrower could legitimately seek a determination from that court as to whether the Judgment exceeded the remit that the bankruptcy judge gave this court by lifting the automatic stay so this litigation could proceed.

The Borrower failed to discharge the order as to the four foreign actions. An action that the Borrower filed in Paris, France, collaterally attacks the Judgment. Although the Borrower asserted that filing that action was necessary under French law, the Borrower did not adequately support that claim. The filing of the Paris action contravened the Judgment and was contumacious.

The Borrower's Delaware counsel represented that the Borrower did not actually file the other three actions, creating a conflict with what the Borrower's non-Delaware counsel told the bankruptcy court. The Borrower's efforts to proceed with the three other foreign actions violated the Judgment and were contumacious.

Ritchie, Wolfe, and Vail failed to discharge the order to show cause. The Borrower responded on behalf of Wolfe and Vail but offered no separate defense of their conduct. Ritchie did not appear in response to the order to show cause. Wolfe and Vail serve as the Borrower's directors. Ritchie is the Borrower's ultimate human controller. They are responsible for the Borrower's contumacious acts.

The Borrower, Ritchie, Wolfe, and Vail are enjoined from proceeding with the Paris action, except to inform the Paris court of this court's ruling and to take steps to dismiss the action without prejudice. The Borrower, Ritchie, Wolfe, and Vail are enjoined from proceeding with the three other foreign actions. The Borrower cannot take any action through Vue Mer without Access Florida's consent or leave of court.

The Lender and Access Florida are awarded the expenses[1] they have incurred and may incur in the foreign actions, as well as the expenses they have incurred and may incur in connection with these contempt proceedings.

## I. FACTUAL BACKGROUND

The Lender loaned $10 million to the Borrower, secured by the Borrower's equity interest in a subsidiary—now Access Florida—that owned real estate (the "Properties"). The Borrower defaulted, and the Lender demanded repayment. To settle the dispute, the Borrower agreed that the Lender owned Access Florida's equity. But the Borrower never recognized that the Lender had gained control of Access Florida and, through it, the Properties. After the Borrower interfered with the Lender's ability to access the Properties, the Lender and Access Florida filed suit seeking equitable relief to secure their rights.

---

[1] Section 145 of the Delaware General Corporation Law (the "DGCL") uses "expenses" as a broad concept that includes both attorneys' fees and amounts paid out of pocket that might be referred to more traditionally and colloquially as expenses. *See, e.g.*, 8 *Del. C.* § 145(a) (authorizing a corporation in a proceeding other than one brought by or in the right of the corporation to provide indemnification "against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred"); *id.* § 145(b) (authorizing a corporation in a proceeding brought by or in the right of the corporation to provide indemnification "against expenses (including attorneys' fees) actually and reasonably incurred"). The out-of-pocket expenses encompassed by Section 145 are broader than the restricted concept of "costs" in the statute that authorizes the recovery of court costs in the Court of Chancery. *See* 10 *Del. C.* § 5106; *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Est. Fund*, 68 A.3d 665, 686–88 (Del. 2013). This decision uses the term "expenses" as it appears in Section 145.

3

After trial, the court entered the Judgment. The Judgment directed the Borrower to "take all actions necessary, in the reasonable judgment of [the Lender], to (i) remove any uncertainty about the domestication of [Access Florida] to Florida; (ii) remove any uncertainty about [the Lender's] title to the shares of [Access Florida]; (iii) ensure that [Access Florida] is the sole owner of the Properties, free of any liens and encumbrances, including if necessary any transfer of title; and (iv) ensure that [the Lender] can access the Properties."[2]

The Judgment entered permanent injunctive relief in favor of the Lender and Access Florida providing as follows: "[The Borrower], Alpha Carta, their associates and affiliates, and anyone acting in concert with them, are permanently enjoined from: (i) asserting any rights to ownership or control over the shares of [Access Florida] or to ownership or control of the Properties; and (ii) interfering in any way with [the Lender's] ownership and control over the shares of [Access Florida] or ownership and control of the Properties."[3]

After entry of the Judgment, the Borrower filed a "Motion for Entry of a Rule to Show Cause, to Enjoin and Void Delaware Final Order and Shorten Notice" (the

---

[2] Order and Final Judgment, Dkt. 312, at 2–3.

[3] *Id.* at 3–4.

4

"Bankruptcy Motion") in a pending bankruptcy proceeding in Chicago, Illinois.[4] The bankruptcy court previously lifted the automatic stay to permit this action to proceed.

The Bankruptcy Motion represented that the Borrower and Vue Mer had filed four foreign proceedings:

- An action in Paris Judicial Court (the "Paris Action"),[5] where the Borrower sought the following relief:

  o An order prohibiting "any attempt to recognize or enforce, against Vue Mer (or indirectly against Vue Mer by ordering [the Borrower], its 100% shareholder), any order issued by a US court, including in Delaware, present or future, concerning any asset of Vue Mer of any nature."

  o An order prohibiting the Lender and Access Florida "from taking any action in France, and to the extent possible in the United States, to 'domesticate' Vue Mer into any other jurisdiction including notably Florida and the Cayman Islands, through any act to be carried out in France."

  o An order prohibiting Access Florida "from taking any action before any authority or court in France, and to the extent possible in the United States, to access lots AI 220 and AE 314, to take possession thereof, to apply for a building permit or any other authorization, to lease, sell, assign, encumber, or enforce any building permit of [Access Florida] or any entity controlled by, affiliated with, or a shareholder of [the Lender] on the land belonging to Vue Mer."

- An action in the Tribunal de Proximité of Saint-Martin & Saint Barthélemy (the "Borrower's Saint-Martin Action"),[6] where the Borrower sought release of liens and €120,000 in damages;

---

[4] *See* Motion for Order to Show Cause, Dkt. 314, Ex. 1.

[5] *See* Bankruptcy Motion, Ex. D-1.

[6] *See id.* Ex. C-1.

5

- An action in the Tribunal de Proximité of Basse-Terre, Guadeloupe (the "Basse-Terre Action"),[7] where Vue Mer sought substantially similar relief as in the Paris Action; and

- An action in the Tribunal de Proximité of Saint-Martin & Saint Barthélemy (the "Vue Mer Saint-Martin Action"),[8] where Vue Mer sought substantially the same relief as in the Borrower's Saint-Martin Action.

Each of the four foreign proceedings collaterally attacked both the relief granted in the Judgment and the findings of fact and rulings of law in the underlying post-trial opinion (the "Opinion").[9] The court held in the Opinion that Vue Mer is the same entity as Access Florida. In addition to attacking the Judgment and Opinion collaterally, the Borrower sought relief contrary to the Judgment and Opinion by purporting to cause Vue Mer to file the Basse-Terre Action and the Vue Mer Saint-Martin Action.

By order dated April 30, 2026, the Court directed the Borrower to show cause why it should not be held in contempt (the "Order to Show Cause").[10] An order that applies to an entity extends to the entity's directors, officers, and employees who act on its behalf or cause it to act. The Order to Show Cause therefore also directed Ritchie, Wolfe, and Vail to show cause why they should not be held in contempt.

---

[7] *See id.* Ex. F-1.

[8] *See id.* Ex. E-1.

[9] *See* Dkt. 303.

[10] *See* Dkt. 316.

The Borrower, Wolfe, and Vail responded to the Order to Show Cause. Ritchie did not.

In its response, the Borrower made two representations that contradicted what the Borrower said in the Bankruptcy Motion. First, the Borrower represented that it only filed the Paris Action and did not file the Borrower's Saint-Martin Action, the Basse-Terre Action, or the Vue Mer Saint-Martin Action (together, the "Island Actions").[11] Second, the Borrower represented in its response that it only filed the Paris Action to preserve a claim under French law to avoid a statute of limitations expiring, not to seek broader relief contesting the Judgment.[12]

---

[11] *Compare* Bankruptcy Motion at 3, 11, 20 (describing "French courts" that are "concurrently exercising jurisdiction" over the same property); *id.* at 4, 13, 15, 17, 19, 23 (referencing "parallel French proceedings"); *id.* Exs. C-1–F-1 (attaching the four foreign filings) *with* Opposition of Defendant Green Sapphire Holdings Inc. and Non-Parties Garrett Vail and Paul Wolfe to Plaintiff's Rule to Show Cause ("Opposition"), Dkt. 333, ¶ 10 (describing the four foreign filings attached as exhibits to the Bankruptcy Motion as "draft papers for *later* filing in France and its overseas departments/collectives" and stating that only the Paris Action had been filed).

[12] *Compare* Opposition ¶ 10 (describing the Paris Action as "relate[d] to the *registre* challenge itself which is . . . a statutory claim over which France holds exclusive jurisdiction") *with* Bankruptcy Motion, Ex. D-1 at 15–16 (requesting, among other things, relief prohibiting "any attempt to recognize or enforce . . . any order issued by a US Court, including in Delaware, present or future" and "any publicity measure . . . to confirm the provisional judicial mortgages" or any action to "take possession thereof" or "to access, use, assign, or exploit" the Properties).

7

## II. LEGAL ANALYSIS

"If an order entitles a party to performance of an act or possession of property, the court may hold a disobedient party in contempt."[13] The Lender asks the court to hold the Borrower, Ritchie, Wolfe, and Vail in contempt for filing the Bankruptcy Motion and the four foreign actions.

### A. Is The Borrower In Contempt?

"To establish civil contempt, [the movant] must demonstrate that the [putative contemnor] violated an order of the court of which they had notice and by which they were bound."[14] "The standard of proof required in a civil contempt proceeding is a preponderance of the evidence."[15]

A trial court has discretion when determining whether to hold a party in contempt.[16] The violation "must not be a mere technical one, but must constitute a failure to obey the Court in a meaningful way."[17] "Even where there has been a

---

[13] Ct. Ch. R. 70(e).

[14] *Handels AG v. Johnston*, 1997 WL 589030, at *3 (Del. Ch. Sept. 17, 1997).

[15] *In re Hurley*, 257 A.3d 1012, 1018 (Del. 2021); *accord TransPerfect Glob., Inc. v. Pincus*, 278 A.3d 630, 649 (Del. 2022).

[16] *Dickerson v. Castle*, 1991 WL 208467, at *3 (Del. Ch. Oct. 15, 1991).

[17] *Id.* at *4 (cleaned up).

violation, the Court will consider good faith efforts to comply with the order or to remedy the consequences of non-compliance."[18]

The Borrower knew about the Judgment and was bound by it. The Borrower did not comply with the Judgment.

Instead, the Borrower launched collateral attacks on the Judgment. By opening five new litigation fronts, the Borrower did not comply with this court's affirmative injunction to take all actions necessary to (i) remove any uncertainty about the domestication of Access Florida to Florida; (ii) remove any uncertainty about the Lender's title to the shares of Access Florida, (iii) ensure that Access Florida is the sole owner of the Properties, free of any liens and encumbrances, or (iv) ensure the Lender can access the Properties. The Borrower did the opposite. A *prima facie* case of contempt exists.

In response to the Order to Show Cause, the Borrower made no effort to demonstrate compliance with the Judgment. The Borrower also did not suggest any misunderstanding about what the Judgment required.

Instead, the Borrower effectively seeks to defend its non-compliance by asserting a litigation privilege. According to the Borrower, it was not contumacious to file the Bankruptcy Motion, file the Paris Action, or prepare and claim to have filed the Island Actions.

---

[18] *Aveta, Inc. v. Bengoa,* 986 A.2d 1166, 1181 (Del. Ch. 2009).

9

The Borrower's response demonstrates that filing the Bankruptcy Motion was not contumacious. Filing the Paris Action, preparing to file the Island Actions, and telling the bankruptcy court that the Borrower and Vue Mer had filed the Island Actions were contumacious.

### 1. The Bankruptcy Motion

To justify the Bankruptcy Motion, the Borrower argues that this court exceeded its remit when adjudicating the merits of this case. The Borrower contends that the bankruptcy court only lifted the automatic stay for a limited purpose, that the Opinion and Judgment went beyond what the order lifting the stay allowed, and that the Borrower properly returned to the bankruptcy court to have that court interpret its order lifting the stay. The Borrower argues that such a course of action could not be contumacious.

In terms of law, the Borrower offers little support for its position. The Borrower references a ruling in a bankruptcy case involving Stream TV Networks, Inc. but without providing either the decision or a citation. The court cannot rely on authority that a party simply claims to exist.

Other authority suggests that state courts retain the power to hold contempt proceedings and impose sanctions, even when a bankruptcy proceeding is ongoing. State court judges certainly strive to defer to their bankruptcy brethren and respect both the Supremacy Clause and the automatic stay. Nevertheless, "there is an exception to the operation of the automatic stay; it does not bar orders to show cause

10

or findings of contempt when necessary to uphold the dignity of a court order."[19] Were this not so, a party could "blatantly violate direct orders of [a] court and then seek shelter from a bankruptcy judge."[20]

On the facts, the Borrower's claim that this court exceeded its remit seems implausible. Nevertheless, it is conceivable that a court in an action that a bankruptcy judge allowed to proceed could exceed its remit. If a party thought that had happened, there would be two logical places for the party to seek relief. One would be to appeal to a higher state court. The other would be to return to the bankruptcy court.

The right answer in that setting is not self-evident. Pursuing an appeal in state court would allow the state court process to play out and enable the appellate court to correct any error, without bothering the bankruptcy court. At the same time, returning to the bankruptcy court would enable the judge who issued the original order lifting the stay to address whether the proceeding exceeded its scope. That judge seems best suited to that task. But returning to the bankruptcy court also potentially opens a parallel appellate track. After the bankruptcy court rules on the

---

[19] *Am. Online, Inc. v. CN Prods., Inc.,* 272 B.R. 879, 881 (E.D. Va. 2002).

[20] *U.S. Sprint Commc'ns Co. v. Buscher*, 89 B.R. 154, 156 (D. Kan. 1988); *accord Summit Fin. Res., L.P. v. Walthers Oil Co.*, 2008 WL 183380, at *2 (D. Utah Jan. 18, 2008).

scope of its order, the aggrieved party could pursue an appeal in the federal court system while an appellate process unfolded in the state court system.

I tend to think that the proper route would be to allow the state court proceeding to play out before returning to the bankruptcy court, but that outcome is not obvious. It was not sufficiently clear that the Borrower could not return to the bankruptcy court by filing the Bankruptcy Motion for that act to be contumacious.

Since the issuance of the Order to Show Cause, the bankruptcy court has denied the Bankruptcy Motion and held that this court had authority to proceed. That still does not mean that the act of filing the Bankruptcy Motion was contumacious. If the Borrower lacked a good faith basis for filing the Bankruptcy Motion, then that would be contumacious, but it also would violate the rules of the bankruptcy court. The bankruptcy court, rather than this court, is the proper tribunal for assessing whether a motion in that court was filed in bad faith.

The Borrower has discharged the Order to Show Cause for purposes of the Bankruptcy Motion. The Borrower has therefore also discharged the Order to Show Cause for purposes of Wolfe and Vail. Although Ritchie did not respond to the Order to Show Cause, the same reasoning applies to him.

### 2. The Paris Action

To justify the Paris Action, the Borrower contends that the Opinion and Judgment went too far by addressing issues of French law and French procedure that this court could not address. The Borrower tries to spin the Paris Action as comparable to the Bankruptcy Motion, but the two are different. The Bankruptcy

12

Motion sought to determine whether this court exceeded the scope of the bankruptcy court's order lifting the automatic stay. The Paris Action openly attacks the Judgment and seeks to re-litigate issues that this court decided in the Opinion.

"A collateral attack is an attempt to avoid, defeat, evade, or deny the force and effect of a final . . . judgment in an incidental proceeding other than by appeal, writ of error, certiorari, or motion for new trial."[21] In the Paris Action, the Borrower not only asks the court to prohibit the Lender and Access Florida from obtaining the relief granted in the Judgment but also seeks different relief that conflicts with the Judgment. The Paris Action is therefore a two-pronged collateral attack on the Judgment.

By filing the Paris Action, the Borrower asserted rights to ownership or control over the shares of Access Florida and to ownership or control of the Properties. The Borrower also interfered with the Lender's ownership and control over the shares of Access Florida and its ownership and control of the Properties. In fact, the mere existence of the Paris Action creates uncertainty about issues that the Opinion and Judgment adjudicated, including the validity of the domestication of Access Florida, the Lender's title to the shares of Access Florida, Access Florida's status as sole owner of the Properties, and the Lender's ability to access the Properties.

---

[21] *In re Tr. FBO duPont Under Tr. Agreement Dated Aug. 4, 1936*, 2018 WL 4610766, at *10 (Del. Ch. Sept. 25, 2018) (citation omitted).

To justify filing the Paris Action, the Borrower cites a case in which this court presided over one aspect of proceedings taking place in multiple jurisdictions, including foreign courts. That often happens, but when an action reaches final judgment, that judgment controls. Thus "when companion cases are pending in sister courts . . . normally each case should proceed unimpeded until final judgment is entered in one of them" such that it can be pled as *res judicata* against the other.[22] Once the Judgment issued, the Borrower had to comply with it. The Borrower could not attack it through the Paris Action.

In its papers and at oral argument, the Borrower contended that features of French law meant that the Borrower risked losing its claims if it did not file the Paris Action and engaged in hand-waiving about a potential statute of limitations problem. The Borrower also claimed that French courts have exclusive jurisdiction over the issues raised in the Paris Action.

A party who seeks to rely on an issue concerning the law of a foreign country must give reasonable notice and adequately support its position so that the court can make a ruling on the nature of the foreign law.[23] The Borrower provided no

---

[22] *Basic Rsch. & Inv. Corp. v. Energy Compounds, Inc.*, 1974 WL 479, at *1 (Del. Ch. Mar. 29, 1974); *see also Est. of Albart v. Lavastone Cap. LLC*, 2021 WL 1063339, at *3 (D. Del. Mar. 18, 2021).

[23] *See* D.R.E. 202(e) ("A party who intends to raise an issue concerning the law of a foreign country must give notice in the pleadings or other reasonable written notice."); Ct. Ch. R. 44.1 (same).

meaningful support for its contentions about French law or the Paris court's purportedly exclusive jurisdiction.[24] At oral argument, the Borrower's Delaware counsel candidly acknowledged that he was not in a position to address issues of French law.

A party seeking to discharge an order to show cause must make a stronger showing than that. If issues of French law were relevant to the Judgment, the Borrower could have raised them, and the court would have considered them. Instead, the Borrower is using the Paris Action to attack the Judgment while trying to cloak its efforts in a fog of generalities.

The filing of the Paris Action was unjustified. It violates the Judgment and is contumacious.

### 3. The Island Actions

To justify the Island Actions, the Borrower makes arguments similar to its position on the Paris Action. According to the Borrower, the Opinion and Judgment went too far by addressing issues of island law and island procedure that this court could not address. The Borrower also stresses that it never filed the Island Actions, despite what it told the bankruptcy court.

The Borrower self-evidently prepared the Island Actions and took steps to get them ready to file. The Judgment required that the Borrower expend resources to

---

[24] *See* Opposition ¶ 10. In the following paragraph, the Borrower concedes that the Paris court may only have concurrent jurisdiction. *Id.* ¶ 11.

implement the Judgment. Instead, the Borrower expended resources preparing drafts of the Island Actions that would attack the Judgment.

The Borrower also violated the Judgment by attaching the drafts to the Bankruptcy Motion. In doing so, the Borrower sought to gain an advantage in the bankruptcy proceeding. That conduct in turn interfered with the Lender's ownership and control over the shares of Access Florida and its ownership and control of the Properties. Indeed, the Borrower's representation that the Island Actions had been filed created uncertainty about those issues. While the filing of the Bankruptcy Motion was not contumacious, claiming to have filed the Island Actions in that motion was contumacious.

## B. What Is The Appropriate Remedy?

The court has broad discretion when formulating a remedy for contempt.[25] The remedy can take the form of civil or criminal sanctions.[26] If the primary purpose of the remedy is to coerce compliance with the court's order, then the remedy is civil in

---

[25] *Israel Disc. Bank of N.Y. v. First State Depository Co. LLC*, 2012 WL 1021180, at *3 (Del. Ch. Mar. 19, 2012); *Jagodzinski v. Silicon Valley Innovation Co., LLC*, 2012 WL 593613, at *2 (Del. Ch. Feb. 14, 2012).

[26] *DiSabatino v. Salicete*, 671 A.2d 1344, 1348 (Del. 1996).

character.[27] If the primary purpose of the remedy is to punish for non-compliance, then the remedy is criminal in character.[28]

When selecting a contempt sanction or combination of sanctions, "a court is obligated to use the least possible power adequate to the end proposed."[29] The sanctions imposed should be "just and reasonable."[30]

### 1. An Anti-Suit Injunction Against The Paris Action

A court "has the inherent power to protect and enforce its judgments by enjoining parties over whom it has jurisdiction from instituting or prosecuting litigation elsewhere."[31] That said, "[t]here are well-defined limits on anti-suit injunctions against suits in foreign countries . . . . based largely on considerations of international comity."[32] But "[w]hen [an anti-suit] injunction is requested after a previous judgment on the merits, there is little interference with the rule favoring

---

[27] *City of Wilm. v. Gen. Teamsters Loc. Union 326,* 321 A.2d 123, 125 (Del. 1974).

[28] *Id.*

[29] *TR Invs., LLC v. Genger*, 2009 WL 4696062, at *18 n.74 (Del. Ch. Dec. 9, 2009) (quoting Am. Jur. 2d *Contempt* § 195).

[30] *Gallagher v. Long*, 940 A.2d 945 (Del. 2007) (TABLE).

[31] *Examen, Inc. v. VantagePoint Venture P'rs 1996*, 2005 WL 1653959, at*2 (Del. Ch. July 7, 2005) (citations omitted).

[32] *In re Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Bumi Negara,* 465 F. Supp. 2d 283, 294 (S.D.N.Y. 2006).

17

parallel proceedings in matters subject to concurrent jurisdiction." [33] Thus, an American court "has authority to enjoin a party before it from suing in a foreign country where such suit is an abusive attempt to undermine that [court's] judgment."[34]

Through the Paris Action, the Borrower seeks to attack and undermine the Judgment. The bulk of the filing does not relate to a purported statutory cause of action. Instead, it repeatedly asserts that the Judgment is flawed. Each form of relief requested in the Paris Action targets a form of relief granted in the Judgment. The Paris Action attacks the Judgment directly, such as by asking the Paris court to indefinitely prohibit its enforcement in France and the United States. The Paris Action also attacks the Judgment indirectly, such as by requesting the Paris court to prohibit various actions related to the Properties themselves, including securing mortgages, liens, or security interests.

The Paris Action is a vexatious attempt to relitigate the Judgment. Under these circumstances, principles of international comity do not require deference. The

---

[33] *Laker Airways Ltd. v. Belgian World Airlines*, 731 F.2d 909, 928 (D.C. Cir. 1984); *see also TQ Delta, LLC v. ZyXEL Commc'ns, Inc.*, 2018 WL 2932728, at \*2 (D. Del. June 12, 2018) (describing the Third Circuit's "restrictive approach" to anti-suit injunctions "at least until one [proceeding] has reached the stage where its ruling becomes res judicata"); *Examen*, 2005 WL 1653959, at \*2 ("Equity will act to protect a party from repetitious and vexatious litigation that threatens irreparable harm.").

[34] *Karaha Bodas Co.*, 465 F. Supp. 2d. at 294; *accord Commercializadora Portimex, S.A. de CV v. Zen-Noh Grain Corp.*, 373 F. Supp. 2d 645, 652 (E.D. La. 2005) (collecting authorities).

Borrower is enjoined from proceeding with the Paris Action except to (1) inform the Paris court of this ruling and (2) take the steps necessary to dismiss the action without prejudice. The Borrower is enjoined from filing a substantially similar action without leave from this court.

### 2. An Injunction Against Filing The Island Actions

The analysis of the Paris Action applies equally to the Island Actions. If the Borrower had filed the Island Actions, either itself or through Vue Mer, then the court would enjoin the Borrower from proceeding with the Island Actions except to (1) inform the courts of this ruling and (2) take the steps necessary to dismiss the actions without prejudice.

The Borrower's Delaware counsel has represented that the Borrower did not file the Island Actions. The injunctive relief is therefore prospective. Without leave from this court, the Borrower is enjoined from taking any further steps to initiate the Island Actions.

### 3. An Injunction Against Vue Mer Purporting To Act

The Borrower planned for Vue Mer to be the plaintiff in the Vue Mer Saint-Martin Action and the Basse-Terre Action. In the Opinion and Judgment, the court held that Vue Mer does not exist as a separate entity. It is the same entity as Access Florida. It may be that the parties must take some steps to implement that ruling procedurally. The Judgment mandates that they take whatever action is necessary.

Vue Mer cannot act independently of Access Florida. Vue Mer is enjoined from taking any action without either Access Florida's consent or leave from this court.

19

Vue Mer must follow Access Florida's instructions for purposes of implementing the Judgment.

### 4. Expenses

When a party has filed a contumacious action in another jurisdiction, the court can award the injured party any expenses associated with the contumacious action so as to make the injured party whole.[35] The Lender and Access Florida can recover the expenses they incurred and any future expenses they incur in connection with the Paris Action and the Island Actions.

Likewise, when a party has been held in contempt, the party injured by the contumacious conduct is entitled to an award of expenses for successfully bringing the contempt motion.[36] The Lender and Access Florida can recover the expenses they incurred bringing this motion as well as all future expenses incurred in compelling compliance with the Judgment.

---

[35] *See, e.g.*, *In re TransPerfect Glob., Inc.*, 2019 WL 5260362, at *14–15 (Del. Ch. Oct. 17, 2019) (collecting authorities, holding party in contempt for instituting action in Nevada, issuing anti-suit injunction, and requiring that party to bear all expenses for Nevada proceeding); *Aveta*, 986 A.2d at 1189–90 (holding party in contempt for participating in proceeding in Puerto Rico, issuing anti-suit injunction, and requiring that party to bear all expenses for Puerto Rico proceeding).

[36] *Miller v. Steller Enters., Inc.*, 1980 WL 6432, at *4 (Del. Ch. Dec. 22, 1980); *accord Israel Disc. Bank of N.Y. v. First State Depository Co., LLC*, 2013 WL 2326875, at *28–29 (Del. Ch. May 29, 2013); *Aveta*, 986 A.2d at 1188; *Triton Constr. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *7 (Del. Ch. May 18, 2009).

## C. The Remedy Against Ritchie, Wolfe, And Vail

An order generally binds not only the named parties, but also "those identified with them in interest, in 'privity' with them, represented by them or subject to their control."[37] This doctrine ensures that a party cannot nullify or evade an order "by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding."[38] The Court of Chancery Rules recognize that in appropriate circumstances, an order can be enforced against non-parties.[39]

Under these principles, an order that applies to an entity extends to directors, officers, and employees of the entity who are acting on behalf of the entity.[40] Ritchie, Wolfe, and Vail must ensure that the Borrower complies with the anti-suit injunction. They are jointly and severally liable for the amounts awarded against the Borrower.

## III. CONCLUSION

The Borrower, Ritchie, Wolfe, and Vail are in contempt. The Lender must submit an order implementing this opinion, on notice to the contemnors. The parties

---

[37] *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945).

[38] *Id.*

[39] *See* Ct. Ch. R. 65(d) (recognizing that an order granting an injunction in binding not only upon the parties but also upon "the parties' officers, agents, servants, employees, and attorneys" and "other persons who are in active concert or participation" with a party subject to the order); Ct. Ch. R. 71 ("When an order grants relief for a nonparty or may be enforced against a nonparty, the procedure for enforcing the order is the same as for a party.").

[40] *Deutsch v. ZST Digital Networks, Inc.*, 2018 WL 3005822, at *10 (Del. Ch. June 14, 2018) (collecting authorities).

21

must confer on the amount of the expense award. If the parties cannot agree on an amount within ten days, then the Borrower and Access Florida may move to quantify it.